IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LISA M. SWEDREN, | CASE NO. 1:24-cv-796 |
| Plaintiff, | DISTRICT JUDGE<br>Charles Esque Fleming |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| COMMISSIONER OF SOCIAL<br>SECURITY, | |
| Defendant. | **REPORT &<br>RECOMMENDATION** |

Plaintiff Lisa M. Swedren filed a Complaint against the Commissioner of Social Security seeking judicial review of its decision denying supplemental security income (SSI). Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court vacate the Commissioner's decision and remand for proceedings consistent with this recommendation.

**Procedural background**

*Previous applications.* In April 2015, Swedren filed an application for SSI benefits. Tr. 68. Her application was denied initially and on reconsideration. *Id.* In November 2015, Swedren requested a hearing before an administrative law judge (ALJ). *Id.* In May 2017, the ALJ held a hearing. *Id.* In June 2017, the ALJ issued a decision denying Swedren's application. Tr. 65–

79. Swedren did not appeal this decision to the Appeals Council and the time for appeal of the June 2017 has passed. The ALJ's June 2017 decision is thus the final decision of the Commissioner as to her April 2014 application.

*Present application.* In October 2018, Swedren filed an application for SSI benefits alleging a disability onset date[1] in October 2018.[2] Tr. 303–308. The Commissioner denied this application both initially and on reconsideration. Tr. 123–26, 155–56. In December 2019, Swedren requested a hearing before an ALJ. Tr. 206. In August 2021, ALJ Jeffery Raeber conducted a telephonic hearing. Tr. 35–64. In October 2021, ALJ Raeber issued a decision denying benefits. Tr. 10–30. In August 2022, the Appeals Council declined review, making ALJ Raeber's decision the final decision of the Commissioner. Tr. 1–6; *see also* 20 C.F.R. § 404.981.

In November 2022, Swedren filed a Complaint against the Commissioner, docketed as case no. 5:22-cv-1952, challenging ALJ Raeber's decision. *See* Tr. 918–922. In April 2023, by stipulation of the parties under Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g), this Court remanded the matter. Tr. 923; *see also* Tr. 939–941.

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     Swedren's counsel clarified during her hearing before ALJ Panek that her amended onset date for the benefits application at issue was October 3, 2018. Tr. 874–75.

In July 2023, the Appeals Council issued an order, which vacated ALJ Raeber's October 2021 decision and remanded Swedren's case for further consideration and proceedings. Tr. 944–46. The Appeals Council's Order detailed the issues to be addressed on remand as follows:

> The hearing decision indicates that the claimant is capable of a reduced range of light work with nonexertional limitations and is capable of jobs that exist in significant numbers in the national economy (Findings 4 and 9). There is a prior Administrative Law Judge decision dated June 26, 2017. The Appeals Council finds the required analysis concerning Social Security Acquiescence Ruling AR 98-4 (6) (*Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) is not sufficient in this case. The Administrative Law Judge states that he is bound by the prior decision from June 26, 2017, in making a finding on the residual functional capacity since no new and material evidence exists and there has been no change in the law, regulations or rulings affecting the findings or the method for arriving at the finding (Decision, page 1). Then, the Administrative Law Judge adopts an almost identical reduced light residual functional capacity consistent with the finding in the prior decision from June 6, 2017, although it does note simple, routine, and repetitive tasks whereas the prior decision notes unskilled work which is slightly different (Decision, page 6).
>
> The Administrative Law Judge does not state how new and material evidence still dictates an almost identical residual functional capacity from the prior decision from June 26, 2017. New and material evidence notes new severe impairments of degenerative disc disease and hypothyroidism which are found

3

in the decision (Decision, page 2). Treatment records concerning degenerative disc disease since the prior decision include an x-ray of the lumbar spine from June 11, 2018, that establishes mild degenerative disc disease (Exhibit D3F, page 20) and radiating pain from the lumbar spine into her leg (Exhibit D3F, page 3). Claimant underwent physical therapy in February 2020 (Exhibit D10F, pages 1-5 and D13F) and chiropractic treatment (Exhibit D11F) for continued complaints of lumbar spine pain. Late 2020 and early 2021 treatment notes showed complaints of back pain with continued complaints of decreased range of motion (Exhibit 20F, page 17). Consideration of this new and material evidence is necessary to determine the claimant's functional abilities.

In addition, a changes in the regulations occurred since the prior decision in terms of evaluating opinion evidence. On March 27, 2017, revisions in the rules concerning the evaluation of medical evidence took effect (HALLEX I-5-3-30). According to these revised regulation, the current rules apply to the claim under review as the claim was filed on October 3, 2018. The prior rules would apply to the decision from June 26, 2017, as that claim was filed on April 16, 2015. This reflects a change in law not contemplated by the Administrative Law Judge when considering the prior decision (Decision, page 1).

Thus, although the decision does apply Social Security Acquiescence Ruling AR 98-4 (6) as required in making a finding on the residual functional capacity, the decision does not note the new and material evidence or the changes in law in evaluating whether the residual functional capacity from the prior decision should be adopted.

The hearing decision does not contain an adequate evaluation of the opinion evidence. Emir Emley, D.C. opined claimant can perform tasks if claimant is limited to lifting, carrying, and pushing less than 10 pounds or given breaks as needed for stretching and to prevent muscle overuse (Exhibit 6F, page 1). The Administrative Law Judge does not evaluate the persuasiveness of this opinion (Decision, page 10). In addition, although the Administrative Law Judge does evaluate the consistency of the opinion with other evidence, the supportability of the opinion is not evaluated (Decision, page 10). In support, Dr. Emley notes scoliosis of the cervical and thoracic region along with deficits in range of motion in the cervical and lumbar spine (Exhibit D6F, page 1). Consideration of the persuasiveness of the opinion of Dr. Emley along with the support provided is required.

Tr. 944–45. And the Appeals Council ordered:

In accordance with Social Security Acquiescence Rulings 98-3(6) (Dennard v. Secretary of Health and Human Services) and 98-4(6) (Drummond v. Commissioner of Social Security), the Administrative Law Judge will provide rationale why any new evidence is or is not material to a particular finding including the residual functional capacity and consider any changes to the law, regulation, or rulings in this rationale (HALLEX I-5-4-62).

Reevaluate the evidence and give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the medical source opinion(s) pursuant to the provisions of 20 CFR 416.920c.

5

> If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

Tr. 945–46.

In December 2023, under the above-described remand order, ALJ Jason Panek held a telephonic hearing. Tr. 868–896. In February 2024, ALJ Panek issued a decision denying Swedren's October 2018 application. Tr. 841–867. Swedren immediately appealed ALJ Panek's decision to this Court. Doc. 1.

**Evidence**[3]

*1. Personal, Educational, Vocational*

Swedren was born in 1970, making her 44 years old on her alleged onset date. *See* Tr. 925. She has no formal education beyond ninth grade. *See* Tr. 926.

---

[3]    The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

6

2. *Medical Evidence*

From November 2014 through, at least, September 2018, Emley Chiropractic treated Swedren. Tr. 596–603. In March 2019, Dr. Emley wrote a letter describing Swedren's treatment for joint and muscle pain and related x-ray imaging of Swedren's spine. Tr. 635, 1169.

In June 2016, Dr. Corina Freitas, Swedren's physician and counselor of two years, completed a psychological assessment for purposes of Swedren's disability application. Tr. 1166–1167. Dr. Freitas found that Swedren had several paranoid delusional thoughts "of religious type" along with poor insight and judgment. Tr. 1167. Dr. Freitas listed Swedren's psychological diagnoses as severe bipolar I disorder with psychosis, situational anxiety, insomnia, and body dysmorphic disorder. *Id.*

Community Mental Health Care provided three letters describing Swedren's treatment with various providers at that organization. *See* Tr. 469, 645, 747. An August 2017 letter related that providers with this organization had treated Swedren since August 2017 for her major depressive disorder, general anxiety disorder, and PTSD. Tr. 469. But it described that Swedren's appointments were interrupted and sporadic because she was nearly homeless and moved often from one relative to another. *Id.* A September 2019 letter reported that Swedren split her time between living with her mother and father, the latter of whom lived in another state. Tr. 645. Swedren regularly attended her bi-weekly counseling sessions when she resided with her mother.

*Id.* An August 2021 letter stated that Swedren attended sessions every two weeks for her anxiety and was "very cooperative with keeping her appointments and is very open to suggestion on development of coping skills and boundaries to help her in in everyday life." Tr. 747.

In October 2017, Dr. Mark Pellegrino, Swedren's pain management provider, referred Swedren to a physical therapist to address her lower back pain. Tr. 450–468. During an April 2020 appointment with Dr. Pellegrino, Swedren had pain in at least 11 of 18 tender points. Tr. 748–50. Dr. Pellegrino assessed fibromyalgia and muscle spasms. Tr. 748–50. In September 2022, Swedren continued to attend pain management appointments to address her chronic low back pain. Tr. 1293.

Throughout her primary care treatment, Swedren reported depression, fatigue, anxiety, bipolar disorder, memory loss, backaches, joint pain, and joint stiffness. *See e.g.*, Tr. 671–76, 683, 798, 801. In May 2019, Swedren presented to a hospital emergency department with complaints of back pain. Tr. 629. During an October 2023 primary care examination, Swedren reported chronic pain, gastroesophageal reflux disease, thyroid disease, anxiety, obsessive compulsive disorder, bipolar disorder, and rage in response to noises. Tr. 1473, 1548.

In March 2020, Dr. Daniel Moretta examined Swedren for her lumbar symptoms and diagnosed her with lumbago.[4] Tr. 654–658. Dr. Moretta referred Swedren for six weeks of physical therapy. Tr. 655.

In April 2020, Certified Nurse Practitioner, Megan Hawk, completed an initial psychiatric evaluation. Tr. 725–731. Swedren reported anxiety, irritable mood, flight of ideas, pressured speech, and paranoia. Tr. 726. Nurse Practitioner Hawk diagnosed Swedren with PTSD and associated depression, mood swings, anxiety, and panic attacks. Tr. 730.

In February 2023, Swedren had another psychiatric evaluation. Tr. 1336–67. Swedren described frequent, severe mood swings between low mood and anger with daily angry outbursts, broken sleep, worthlessness, hopelessness, guilt, limited concentration, and daily suicidal ideation. Tr. 1366–1367. She also conveyed severe anxiety with manic symptoms and psychosis. Tr. 1367. April 2023 progress notes from Swedren's mental health provider, reflected that Swedren's goal was to increase her level of functioning and to have more good days. Tr. 1405.

In September 2020, Renal Consultants, Inc. examined Swedren and assessed that she likely had acute renal failure. Tr. 817–18.

In February 2021, Swedren sought treatment from a different chiropractic office, Grubbs Family Chiropractic, for her neck and back pain,

---

[4]     Lumbago is a nonmedical term for any pain in the lower back. *See* Dorland's Illustrated Medical Dictionary 1062 (33rd ed. 2020).

which she claimed were caused by her activities of daily living. Tr. 1192. Swedren's goals for this chiropractic treatment were to promote proper alignment and function, improve strength and conditioning, and reduce pain. Tr. 1195.

In April 2022, Swedren underwent a lumbar MRI. Tr. 1204–1205. Her MRI showed mild central canal stenosis, bilateral lateral recess, and moderate right foraminal narrowing with possible impingement of the exiting right L4[5] nerve root. Tr. 1205.

In June 2022, Swedren presented to Dr. Moretta for a "recheck of her lumbar symptoms." Tr. 1250. She reported a 70% improvement after an injection at her last visit but described constant aching in her lower back and both hips with occasional burning in her hips. *Id.* Dr. Moretta diagnosed gluteal tendinitis in the right hip and somatic dysfunction of Swedren's sacroiliac region. Tr. 1251.

---

[5]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, M.D., Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id.* The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, M.D., Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

10

In May 2023, Swedren received x-ray imaging of her lumbar spine, which revealed degenerative disc and facet disease at L4/5 and L5/S1 including grade 1 anterolisthesis at L4 to L5. Tr. 1430. She also had imaging of her cervical spine, which showed evidence of multilevel degenerative disc disease in her cervical spine most significant at C5/C6. Tr. 1432.

### 3. *State Agency Reviewers*

In November 2018, state agency reviewing physician Gail Multcher, M.D., adopted the residual functional capacity (RFC)[6] set out in the ALJ's June 2017 decision. Tr. 98. Dr. Multcher found in particular that Swedren had the residual functional capacity to perform light work except she could never climb ladders, ropes, or scaffolds; could occasionally crawl and climb ramps or stairs; frequently stoop, kneel, and crouch; frequently handle and finger objects bilaterally; could have frequent exposure to pulmonary irritants and poor ventilation; and, that she must avoid the use of moving machinery, commercial driving, and unprotected heights. Tr. 98. In setting out these findings, Dr. Multcher stated that she considered the medical evidence from the period between the previous ALJ's decision and when she issued her findings and determined that no new and material evidence in the record supported a

---

[6]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

change in Swedren's RFC. *Id.* On reconsideration, Leon Hughes, M.D. affirmed Dr. Multcher's findings in whole. Tr. 115–16.

### 4. Hearing Testimony

In December 2023, ALJ Panek held a telephonic hearing. Tr. 869–96. Swedren confirmed that she still experienced the pain and mental health issues that she described to ALJ Raeber during her earlier hearing. Tr. 876–77. She clarified that her symptoms had worsened from October 2021, specifically that her back pain worsened in that time. Tr. 877.

Swedren testified that she could stand in one place for about 10 minutes, sit in one place for 10 to 15 minutes, and walk for 20 to 30 minutes, but "after that it's way too much" and she would need to lie down flat because her muscles would spasm. Tr. 877–81. She described hip and leg pain and that her pelvis went out of place which caused her to be "off kilter." Tr. 878. Swedren explained that she is "most comfortable laying down or like reclining" and that she used various techniques to alleviate her back pain, including heating her back, using a foam roller, or doing stretches that her physical therapist gave her. Tr. 881. She stated that she cannot lift more than five pounds and that she could not lift a gallon of milk. *Id.* When asked if other day-to-day activities aggravated her pain, Swedren expressed that she had severe noise sensitivity and exposure to loud sounds aggravated her physical pain. Tr. 882–83. She also said that doing dishes or dusting aggravated her pain. Tr. 883. Swedren testified that certain therapeutic treatments, like physical therapy and

12

chiropractic adjustments, helped. Tr. 884. She also said that certain medications helped, but others made her tired or "feel like a zombie the next day." Tr. 884–85.

Swedren explained that her "anxiety gets worse all the time" and that her pain and mental health triggers "play off each other[,]" such that when she is anxious it also causes her physical pain to get worse. Tr. 885. She described that her bipolar disorder, specifically manic episodes, caused her to talk louder and louder without realizing and that she became embarrassed when someone pointed out her rapid speech and volume. Tr. 886. Swedren also testified that she had body dysmorphic disorder, was depressed all the time, and had panic attacks. Tr. 886–87.

Swedren described migraine headaches one to two times a week, Tr. 888, and problems with concentration along with short-term memory problems and difficulty thinking, Tr. 890. She also stated that she sometimes doesn't get dressed or shower and that she washes her hair twice per month. Tr. 891.

### 5. *Vocational Expert*

Qualified vocational expert Thomas Nimberger also testified at the December 2023 hearing. Tr. 892–95. The ALJ found that Swedren had no past relevant work and then provided Mr. Nimberger with the description of a hypothetical individual. Tr. 892–93. The hypothetical individual had limited education, no past relevant work, and was limited to performing light work with additional functional limitations. Tr. 893. Mr. Nimberger testified that

there were a significant number of jobs in the national economy that the first hypothetical individual could perform, including: office cleaner, marker, or mail clerk. Tr. 894.

Swedren's representative modified the hypothetical, such that the individual would miss one day of work per week or would be off task 20% of the workday. Tr. 894–95. Mr. Nimberger stated that both modifications would be work preclusive. Tr. 894–95.

### 6. Consultative Examiners

In February 2019, on referral by the Ohio disability determination services, Dr. Bryan Krabbe completed an initial psychological consultative examination. Tr. 613–19. He diagnosed Swedren with: unspecified bipolar and related disorder, unspecified alcohol related disorder in sustained remission, and unspecified stimulant related disorder in sustained remission. Tr. 618. Dr. Krabbe responded to several questions in a section titled "Functional Assessment." Tr. 618–19. Dr. Krabbe's responses provided summaries of Swedren's psychological symptoms and behavior along with some conclusions about how Swedren's mental health might affect her in the workplace. Tr. 618–19.

In April 2023, Dr. Krabbe conducted a second psychological consultative examination. Tr. 1357–1363. He diagnosed Swedren with major depressive disorder, PTSD, and unspecified alcohol related disorder in sustained remission. Tr. 1362. Again, Dr. Krabbe responded to several questions in a

14

section called "Functional Assessment." Tr. 1362–63. Dr. Krabbe summarized Swedren's descriptions of her symptoms and how they affected her in various functional areas. Tr. 1362–1363.

Also in April 2023, Swedren underwent a physical consultative examination. Tr. 1393–1396. The consultative examiner found that Swedren's functional limitations resulted from mental health issues and chronic pain and assessed various physical functional limitations. Tr. 1396.

**ALJ's Decision**

The ALJ made the following findings of facts and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 3, 2018, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: Degenerative Disc Disease of the Lumbar Spine; Hypothyroidism; Fibromyalgia; Unspecific Myalgia and Myositis; and Bipolar Disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs. She can

frequently stoop, kneel, and crouch. She can frequently handle and finger bilaterally. She can frequently work in pulmonary irritants and poor ventilation. She should avoid work around moving machinery, commercial driving, or unprotected heights. The claimant can perform unskilled (SVP 1-2) work, free of fast-paced production requirement and only routine workplace changes that are explained or demonstrated in advance. She can have occasional public contact, but no interaction. She can have occasional, superficial interaction with co-workers, superficial contact meaning no arbitration, negotiation, confrontation, direction of the work of others, persuasion of others or responsibility for the safety or welfare of others.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on December 19, 1970 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 3, 2018, the date the application was filed (20 CFR 416.920(g)).

Tr. 847, 848, 850–51, 857–58.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past

17

relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial

evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Before proceeding to Swedren's two enumerated issues, the Court notes that Swedren raises an overarching argument that the ALJ failed to address everything the Appeals Counsel directed the ALJ in its remand order to address. *See* Doc. 7, at 11, 19, 24. Neither party discusses whether this Court has jurisdiction to address the ALJ's alleged failure to adhere to an Appeals

Council's remand order. But most courts in this Circuit have found that federal courts lack jurisdiction to consider this issue. *See Sisson v. Colvin*, No. 5:15-CV-552, 2016 WL 8671906, at *12 (N.D. Ohio June 14, 2016) (internal citations omitted). It is also unclear—since neither party discusses the issue—whether it makes any difference that the Appeals Council issued the remand order in relation to a different case and as to a different ALJ decision or that Swedren did not appeal ALJ Panek's decision, which is the subject of this appeal, to the Appeals Council. *See* Doc. 1. Regardless, for the reasons stated below, I recommend remand of ALJ Panek's decision.

1.    *The ALJ applied the wrong standard when considering the evidence applicable to Swedren's successive disability claim.*

Swedren first asserts that the ALJ erred by adopting an RFC that was identical to the previous RFC because the ALJ did not properly weigh new evidence as required by *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018). *See* Doc. 7, at 11. Review of the ALJ's decision reveals that the ALJ erred when considering the earlier adjudications of Swedren's previous disability applications. Tr. 845. Additionally demonstrating the ALJ's failure to apply the more recent *Earley* standard, the ALJ found certain medical evidence persuasive based on an improper evaluation of that evidence. Tr. 855.

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit held that previous decisions "clearly demonstrate that the principles of res judicata can be applied against the Commissioner. When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the

Commissioner is bound by this determination absent changed circumstances."
126 F.3d 837, 842 (6th Cir. 1997).

The Social Security Administration adopted this decision as
Acquiescence Ruling 98-4(6), 63 Fed. Reg. 29,771 (June 1, 1998). In this Ruling
the Administration instructed that:

> When adjudicating a subsequent disability claim
> with an unadjudicated period arising under the
> same title of the Act as the prior claim, adjudicators
> *must* adopt such a finding from the final decision by
> an ALJ or the Appeals Council on the prior claim in
> determining whether the claimant is disabled with
> respect to the unadjudicated period unless there is
> new and material evidence relating to such a finding
> or there has been a change in the law, regulations or
> rulings affecting the finding or the method for
> arriving at the finding.

*Id*. at 29, 773 (emphasis added).

As it turned out, the Social Security Administration overread
*Drummond*. And in *Earley*, the Sixth Circuit corrected that error. The Court
in *Earley* explained that "[w]hen an individual seeks disability benefits for a
distinct period of time, each application is entitled to review. There is nothing
in the relevant statutes to the contrary. And res judicata only 'foreclose[s]
successive litigation of the very same claim.'" 893 F.3d at 933 ("a claim that
one became disabled in 1990 is not the same as a claim that one became
disabled in 1994."). Rather, under *Earley*, a claimant is entitled to a "fresh
review," *id*. at 934,  free from the presumption that a previous "RFC remains
the correct RFC for" a later claim, *Nadjl v. Comm'r of Soc. Sec.*, No. 21-cv-

21

01578, 2022 WL 2820413, at *9 (N.D. Ohio July 8, 2022), *report and recommendation adopted*, 2022 WL 2818444 (N.D. Ohio July 18, 2022); *see also Anthony L.M. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00525, 2022 WL 10638159, at *3–4 (S.D. Ohio June 27, 2022); *DiLauro v. Comm'r of Soc. Sec.*, No. 19-cv-2691, 2021 WL 1175415, at *3 (N.D. Ohio Mar. 29, 2021); *Ferrell v. Berryhill*, No. 16-cv-0050, 2019 WL 2077501, at *5 (E.D. Tenn. May 10, 2019) ("The point of *Earley*, … is that regardless of her chances of success, an applicant should have the opportunity for a full hearing, *with no presumptions applied*, when the claim covers a new period of time not addressed in the prior hearing") (emphasis added).

The Sixth Circuit also said in *Earley* that "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, *albeit not binding*, consideration in reviewing a second application." 893 F.3d at 933 (emphasis added). An ALJ may "consider a previous ALJ's RFC" determination but "errs … when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, No. 18-cv-00859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019), *report and recommendation adopted*, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020).

Here, the ALJ did what Earley and its progeny prohibit—use the previous RFC determination as a presumptively correct starting point. *See Anthony L. M.*, 2022 WL 10638159, at *4 (faulting an ALJ for "adher[ing] to" a

previous "decision as a mandatory starting point"). While the ALJ in Swedren's case did not err by finding that res judicata applied to the disability period applicable to Swedren's 2017 disability determination, Tr. 845, and he accurately explained that there is "new and material evidence *in the case at hand*[,]" Tr. 845, he did not give Swedren's application a "fresh look." *See Earley*, 893 F.3d at 931. Instead, the ALJ used the previous RFC determination as a mandatory starting point and required Swedren to present "compelling, new information" before "depart[ing] from the … prior ALJ findings." Tr. 855. And, when evaluating Dr. Krabbe's medical opinions, the ALJ expressed that the evidence and symptoms described did not "warrant a deviation from the prior ALJ decision mental residual functional capacity evaluation in June 2017." Tr. 856. These statements show that the ALJ did not view Swedren's claim through the requisite lens.

Swedren relies on *DiLauro*, 2021 WL 1175415, at *3–4, to support her argument that the ALJ's error "casts a pall over the entire hearing as Plaintiff faced an unwarranted presumption that the findings of the prior hearing were correct." Doc. 7, at 18. The ALJ in that case "cite[d] *Drummond* for the very principle that *Earley* rejected–that '[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ.'" *Id.* at *3. That Court noted that the ALJ repeatedly gave "great weight" to state medical consultants opinions that relied on *Drummond*, and which were offered before *Earley* was issued. *Id.* at *4.

23

Here, the ALJ not only cited *Drummond*, rather than *Earley*,[7] but also, as in *DiLauro*, gave great weight to medical evidence that itself relied on *Drummond* to adopt earlier RFC determinations. *See id.*; Tr. 845, 855. Indeed, both Dr. Multcher and Dr. Hughes stated that under Acquiescence Ruling 98-4 and *Drummond*, they adopted the previous ALJ's RFC determination. Tr. 98, 115. "This alone warrants reversal." *Anthony L.M.*, 2022 WL 10638159, at *3 (remarking that an ALJ "adopted the recommendations of" two "doctors who adopted [a previous ALJ's] decision without recognizing that Plaintiff's application covered a new period").

So although the ALJ summarized medical evidence from 2018 through 2023, Tr. 852–854, he did not properly evaluate that new evidence in light of *Earley*. In particular, the ALJ's stated explanation of the weight that he gave the state agency reviewer's findings is inconsistent with *Earley*. *See* 893 F.3d at 933.

In this regard, the ALJ found both state agency reviewers' opinions, which adopted the June 2017 decision, persuasive. *See* Tr. 98, 115. A state agency reviewer's opinion is often based on an incomplete record. *See, e.g.*, *Jones v. Colvin*, No. 13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12,

---

[7]     The ALJ's failure to cite *Earley* does not, on its own, constitute a failure to apply proper legal standards. *See Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-cv-2015, 2020 WL 4366077, at *13 (N.D. Ohio July 30, 2020) ("[T]his court reviews whether the ALJ *applied proper legal standards*, not whether the ALJ provided *proper legal citations*."). But it does give the Court pause. After all, the Sixth Circuit issued *Earley* in 2018 and the ALJ in this case issued his decision nearly six years later in February 2024.

2014) ("[b]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it.") (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3rd Cir. 2011)). So long as an ALJ considers the later evidence and takes "into account any relevant changes in [the claimant's] condition," the ALJ will not err in relying on the state agency reviewers' opinions. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, however, the ALJ did not elaborate on whether or how much the reviewers' opinions remained persuasive in light of the new evidence. *See* Tr. 855. Instead, the ALJ applied a standard that is not supported by *Earley* to find the state agency reviewers' opinions, which self-evidently did not apply *Earley*, persuasive. *Id.* (reasoning that "there is no compelling, new information that would require a departure from the claimant's prior ALJ findings").

The ALJ's errors here are nearly identical to the two primary errors found in *Anthony L. M. v. Comm'r of Soc. Sec. See* 2022 WL 10638159 at 3–4. First, the ALJ's adoption of state agency reviewer's opinions that themselves adopted a prior decision based on *Drummond* could "alone warrant[] reversal." *Anthony L. M.*, 2022 WL 10638159, at *3 (finding that the ALJ violated the principles set out in *Earley* by adopting the recommendations of two reviewers who applied *Drummond* to adopt prior RFC findings without recognizing that

25

Plaintiff's application was for a new period). Second, the ALJ's description of how he evaluated the opinion evidence, specifically from the state agency reviewers, shows that he viewed the prior ALJ's findings as a necessary starting point. *See* Tr. 855 ("[T]here is no compelling, new information that *would require a departure from* the claimant's prior ALJ findings."). This was an error because it shows that the ALJ "did not perform a *de novo* review of the medical record with respect to [Swedren's] new claim." *See Anthony L.M.*, 2022 WL 10638159, at *4 (citation omitted).

As a final matter, the ALJ repeatedly stated that he evaluated all the evidence in making his decision. *See, e.g.*, 846, 847, 850, 851. The ALJ's decision, however, belies this statement. As explained above, the ALJ's description of how he evaluated certain evidence shows that he failed to take a "fresh look" at Swedren's current application*,* which covered a distinct period from her earlier applications. *See Earley*, 893 F.3d at 931, 933. So remand is necessary.

> 2. *The ALJ failed to properly articulate his evaluation of certain medical opinion evidence.*

Swedren's second argument points to medical opinion evidence that the ALJ discussed and, generally, argues that the ALJ's evaluation failed to meet the standards set out in applicable regulations. *See* Doc. 7, at 20.

First, Swedren argues that when "the ALJ found that the restrictions imposed by Dr. Erin Embly were not persuasive as chiropractors are not acceptable medical sources," he failed to "sufficiently address" supportability

and consistency. Doc. 7, at 21 (citing Tr. 856). This statement ignores the fact that the ALJ also articulated that Dr. Emley's findings were rejected as unpersuasive because they "were not supportive of or consistent with the totality of [Swedren's] medial evidence of record, including physical examination findings." Tr. 856. While the ALJ's statement as to the supportability and consistency of Dr. Emley's findings is limited, Swedren has not explained how the ALJ failed to "sufficiently address" these factors. So she's forfeited the argument. *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited."). To the extent that Swedren's second issue challenges the ALJ's evaluation of Dr. Emley's findings, it fails.[8]

Second, Swedren argues that the ALJ improperly excluded and failed to explain the exclusion of certain mental limitations set out in Dr. Krabbe's persuasive medical opinion. Doc. 7, at 22–23. Swedren's argument is muddied, however, by the fact that she does not describe which of the mental limitations opined by Dr. Krabbe that the ALJ failed to include. Doc. 7, at 23. Instead, she

---

[8]     In apparent relation to this argument, Swedren asserts that the ALJ erred in his evaluation of Dr. Emley's opinion and challenges the ALJ's decision to instead rely on the state agency reviewer's opinions. Doc. 7, at 21 (stating that "rather" than support his analysis of Dr. Emley's opinions with substantial evidence, the ALJ "relied on the opinions of state agency reviewers who last reviewed this matter in November 2019 and incorrectly found [the reviewer's] opinions persuasive."). The merits of Swedren's argument that the ALJ erred in finding persuasive and relying on the state agency reviewer's opinions is addressed above. *Supra* discussion at p. 24–26.

summarizes the ALJ's description of Dr. Krabbe's finding that she had "difficulty dealing with normal pressures in a workday setting leading to agitation, withdrawal, and emotional instability along with difficulty getting along with people and maintaining interpersonal relationships." Doc. 7, at 23 (citing Tr. 856). And she asserts that when the ALJ failed to explain why he excluded these limitations from her ultimate RFC, he violated *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3–4 (6th Cir. May 20, 2024). *Id.*

In *Kinney* the Sixth Circuit affirmed that an ALJ need not incorporate every limitation set out in a medical opinion, even where that medical source's opinion is considered persuasive. 2024 WL 2273365, at *3 (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015)). But the Court clarified that if an ALJ finds that a medical opinion is persuasive but decides not to include all limitations set out in that medical opinion, then the ALJ must explain why he did not include all of the limitations. 2024 WL 2273365, at *3 (citing Social Security Ruling 96-8p, 61 Fed. Reg. 34,474 (July 2, 1996)).

Under *Kinney*, therefore, the ALJ was required to explain why he did not include certain limitations from Dr. Krabbe's persuasive medical opinion into Swedren's RFC determination.

Swedren's circumstance is complicated, however, by the fact that Dr. Krabbe's medical opinions do not set out the explicit mental limitations he presumably assessed. *See* Tr. 1357–63. Instead, his opinions provide

28

summaries of Swedren's described symptoms in relation to various questions which appear to relate to certain areas of mental functional limitations. *See* Tr. 1362–63. Dr. Krabbe's responses in the "Functional Assessment" portion of his reports loosely reflect what his conclusions presumably were, but they do not present any clear functional limitations that directly correspond to the ALJ's RFC assessment. *See* Tr. 1362–63 (answering questions asking for an "assessment" of Swedren's functional limitations in various categories and detailing how she performed or what issues she "reported" or "described" in a given category). For this reason, the Commissioner understandably asserts that Dr. Krabbe's findings do not represent a "medical opinion" under applicable regulations. Doc. 9, at 15. But the ALJ concluded that Dr. Krabbe's findings *were* both medical opinions and both persuasive. Tr. 856. And it is not the Court's role to reassess the medical evidence. *Bass*, 499 F.3d at 509. The Court thus must assume for purposes of this argument that Dr. Krabbe's findings represent a medical opinion that, because the ALJ found it persuasive, must be properly assessed as the Sixth Circuit described in *Kinney*.

The ALJ's decision, however, does not explicitly state what limitations stemmed from Dr. Krabbe's medical opinion. And review of Dr. Krabbe's reports provide no certainty as to which of the limitations that the ALJ adopted originated from Dr. Krabbe's medical opinion. For the most part, the ALJ, like Dr. Krabbe, simply stated how Swedren "performed" and what Swedren "reported" or "described." *See* Tr. 856. The ALJ then concluded that "[m]ental

29

health symptoms would cause her difficulties dealing with normal pressures in a workday setting leading to agitation, withdrawal, and emotional instability." *Id.* (citing generally to both of Dr. Krabbe's reports). The ALJ did not explain which of the mental functional limitations assessed by Dr. Krabbe, assuming there were any, support his conclusion that Swedren would have certain "difficulties." The ALJ also failed to connect that conclusion to any particular mental limitation in Swedren's RFC assessment. *Id.* The only limitations contained in Swedren's RFC that seem to relate to her mental functioning are:

> The claimant can perform unskilled (SVP 1-2) work, free of fast-paced production requirement and only routine workplace changes that are explained or demonstrated in advance. She can have occasional public contact, but no interaction. She can have occasional, superficial interaction with co-workers, superficial contact meaning no arbitration, negotiation, confrontation, direction of the work of others, persuasion of others or responsibility for the safety or welfare of others.

Tr. 851.

While perhaps the above limitations are designed to address the ALJ's interpretation of the record and relate to his conclusion that Swedren would have "difficulties dealing with normal pressures in a workday setting[,]" the ALJ did not explain that. The ALJ also did not explain whether or how Dr. Krabbe's findings correspond to the limitations the ALJ ultimately included in Swedren's RFC. Without this explanation, there is an incongruity between the

30

two, two-page functional assessment responses provided by Dr. Krabbe and the one paragraph analysis provided by the ALJ. And *Kinney* instructs that this disparity should have been explained. *See* 2024 WL 2273365, at *3. But it was not.

Review of Dr. Krabbe's opinion to determine whether all of the opined limitations were included, since which Swedren argues they were not, offers little clarity. So the Court can't tell whether the ALJ's incorporated mental limitations correspond with Dr. Krabbe's opinion or are otherwise supported by substantial evidence. Because the Court cannot assess whether the ALJ did or did not include all of Dr. Krabbe's opined limitations, assuming there were any, the Court should remand on this issue as well.

### Conclusion

For the reasons explained above, I recommend that the Commissioner's decision be vacated and remanded for proceedings consistent with this opinion.

Dated: December 3, 2024

                                    */s/ James E. Grimes Jr.*
                                    James E. Grimes Jr.
                                    U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).